The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68103-2578

TODD BRENNER
BRENNER LAW OFFICES
555 METRO PLACE NORTH
SUITE 100
DUBLIN OH 43017

EXHIBIT
2

Lincoln Financial

The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68103-2578
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-0401

February 18, 2026

Todd A. Brenner
Brenner Law Offices
555 METRO PLACE NORTH
SUITE 100
DUBLIN, OH 43017

RE: Deceased: Nathan Winstel
Policyholder: Insight Enterprises, Inc.
Policy #: SA3-890-LF1196-01
Claim #: 17306591

Dear Todd A. Brenner:

We have completed the appeal review of the above-referenced claim for Accidental Death benefits under Group Life Insurance Policy No. SA3-890-LF1196-01 (hereinafter "Policy") issued by The Lincoln National Life Insurance Company (hereinafter "Lincoln") to Insight Direct USA, Inc. We have determined that the denial of benefits will be maintained.

**Initial Claim Decision**

Accidental Death and Dismemberment insurance benefits were initially denied on the basis that Mr. Nathan Winstel's death was contributed to or caused by ingesting a controlled substance thus he did not meet the Policy provision for consideration of an Accidental Death.

The basis for the decision was outlined in a letter dated August 01, 2025. Ms. Stella Winstel was provided an opportunity to request an appeal review of the denial by submitting a written request stating the reasons why the claim should not have been denied and submitting additional information to support the claim.

**First Appeal**

We received a request for reconsideration from Ms. Stella Winstel on September 3, 2025 in which she stated Mr. Winstel's overdose was accidental. Ms. Winstel noted he was taking prescribed medications with the exception of Kratom, and she indicated Kratom is not a controlled substance thus requested reconsideration of the claim.

A review of information on file during the initial appeal evaluation concluded that Mr. Winstel's diagnosis of cardiac disease caused or contributed to his death. Additionally, the initial appeal

evaluation concluded that the combination of his medical conditions, medications, and Kratom use caused and/or contributed to his death. Therefore, it was determined that Mr. Winstel's death was not independent of all other causes and his death is not considered accidental under the Policy. The denial of accidental death benefits was maintained. The basis for the decision was outlined in a letter to Ms. Stella Winstel dated September 22, 2025. Ms. Winstel was provided additional appeal rights at that time.

**Second Appeal**

We received your request for reconsideration on December 17, 2025. In the letter of appeal, you indicated that Mr. Winstel was not on cardiac medication and did not have a known history of heart disease. You stated he also did not have a seizure disorder. You stated that Dr. Anne Shepler who performed Mr. Winstel's autopsy concluded that Mr. Winstel's "mitragynine (Kratom) level was in the lethal range and his fluvoxamine level was in the toxic range and therefore the toxic effects are a direct and more plausibly independent cause of his death". It was noted this is so because, in part, "we cannot definitively establish that Mr. Winstel's cardiac abnormalities contributed to his death." You discussed that Mr. Winstel's family physician of more than 12 years, Dr. Maria Varveris did not prescribe any medication "that was being taken directing at treating a specific cardiac condition" and medical records did not establish a prior diagnosis of cardiac disease. You stated that Dr. Varveris disagrees "that Mr. Winstel suffered from heart disease or had any clinically significant cardiac abnormalities." You noted that Dr. Varveris also disagrees with the theory that Mr. Winstel "knew or should have known that the combination of his prescribed medications and mitragynine was potentially lethal." You discussed that Mr. Winstel had been purchasing kratom products online since 2016. Further you stated he was not aware of and was never warned about any serious risks or dangers associated with kratom use. You asserted that it seems apparent that the accidental drug overdose was the cause of Mr. Winstel's death, independent of all other causes. You indicated that Mr. Winstel valued his life deeply and was 45 years old when he passed away. You stated he took kratom to improve his life, not endanger it, and certainly did not intend to hurt himself. You stated he died as the result of ingesting a lethal combination of drugs which you indicated was confirmed by Dr. Varveris, his family physician who reviewed all relevant information and treated Mr. Winstel for years concluding: "the accidental drug overdose was the sole cause of his death, independent of all other causes."

In support of the appeal, you submitted a letter dated December 10, 2025 from Anne M. Shepler, MD, a letter dated December 16, 2025 from Maria Y. Varveris, MD, and the declaration of Stella Winstel. Also included was a copy of a receipt from Gaia Ethnobotanicals dated July 26, 2016, a receipt from KratomsourceUSA dated November 08, 2016, and order tracking information from Happy Hippo.

In her December 10, 2025 letter, Dr. Shepler indicated that per the autopsy and toxicological findings, she opined in her report that Mr. Winstel's cause of death was due to the combined toxic effects of mitragynine and fluvoxamine. She stated she listed within the "other significant conditions" or "Part II" of the death certificate cardiac findings that were only found at the microscopic level (myocardial fibrosis, adipose infiltration, and intramyocardial arteriosclerosis). She stated there was no significant atherosclerotic disease of the major coronary arteries at autopsy and Mr. Winstel was not prescribed any cardiac medications based upon the reviewed available medical records. Furthermore, she stated that Mr. Winstel had a recent echocardiogram after an episode of seizure activity in 2024 which was interpreted as normal. She stated this episode of

seizure activity was an isolated event and Mr. Winstel did not meet the criteria of having a seizure disorder. Dr. Shepler indicated that in the autopsy report, she stated that the microscopic abnormalities have the potential to cause a cardiac arrythmia which can cause a sudden death. She stated that a definitive diagnosis of a fatal cardiac arrythmia cannot be made at autopsy as this would require the person to be alive and have an electrocardiogram performed at the time of arrythmia. In Mr. Winstel's case, she stated he was already in asystole at the time of arrival of emergency medical personnel, therefore, "it is very much possible Mr. Winstel died *with* these cardiac abnormalities but not *from* them." Dr. Shepler indicated that based on toxicological analysis, Mr. Winstel's mitragynine (Kratom) level was in the lethal range and his fluvoxamine level was in the toxic range and therefore the toxic effects are a direct and more plausibly independent cause of his death. Dr. Shepler cited the policy's exclusion regarding "[n]o benefits are payable for any loss that is contributed to or caused by: disease, bodily or mental illness (or medical or surgical treatment thereof)". She argued that this exclusion is not met "Since we cannot definitively establish that Mr. Winstel's cardiac abnormalities contributed to his death." Dr. Shepler also discussed that most of the general public would not know the serious dangers of Kratom use. She explained in Ohio, Kratom can be legally bought at gas stations, smoke shops, or online and is often marketed as a "natural" product. Furthermore, she discussed there is currently no labeling requirements in Ohio on the packaging of Kratom to warm about any serious bodily injuries or death. She stated that while the FDA has recently warned of the potential harm of Kratom, these warnings are not visible to the consumer at the point of sale. She stated that given "Kratom's legal retail availability, lack of standardized warnings, and marketing as a natural product/supplement, an ordinary consumer would not reasonably foresee that Kratom use could cause serious injury or death."

The letter from Dr. Maria Y. Varveris dated December 16, 2025 indicated she treated Mr. Nathan Winstel for more than 12 years. She stated that during that time, she saw him on a regular basis, performed laboratory testing, appropriate diagnostic studies and treated him for depression, anxiety, insomnia, and restless leg syndrome. She stated she treated his cholesterol with atorvastatin however, this was started for primary prevention and was not being directed at a condition of heart disease or any cardiac abnormality. She stated at no time did she prescribe a medication that was being directed at treating a specific cardiac condition. She discussed that on May 14, 2024, a stress test was performed to evaluate a cause for reported syncope versus seizure. At that time, the ejection fraction was 65% "which is well within normal". She stated there were no valvular abnormalities and the EKG portion of the stress test was normal. Dr. Varveris indicated that at the time of Mr. Winstel's death, he was taking Atorvastatin for high cholesterol, pramipexole and gabapentin for restless leg syndrome, and a number of mediations from a psychiatric standpoint prescribed by another provider. She stated he was on Lamictal for mood stabilization, BuSpar for anxiety, and fluvoxamine for anxiety. She noted he was also taking propranolol which can be used for cardiac conditions, but was being directed at his anxiety. Dr. Varveris stated she reviewed the autopsy report and death certificate which documents the cause of death as the combined toxic effects of mytragynine and fluvoxamine. Other significant conditions noted were myocardial fibrosis, adipose infiltration and intramyocardial arteriosclerosis of uncertain etiology. Dr. Varveris stated there was no significant coronary disease of the major coronary arteries noted. She stated the medical documentation does not establish a prior diagnosis of cardiac disease during life and no clinically established cardiac abnormality was documented in his medical history. Dr. Varveris stated she disagreed with the conclusion that Mr. Winstel suffered from heart disease or had any clinically significant cardiac abnormalities. She stated the autopsy findings represent microscopic changes of uncertain etiology, not a diagnosed or known cardiac condition. Dr. Varveris also stated her disagreement with the conclusion that Mr. Winstel knew or should have known that the

combination of his prescribed medications and mitragynine was potentially lethal.

The statement of Stella Winstel indicated Nathan Winstel was her husband for over 12 years. She stated that though Mr. Winstel experienced anxiety and depression, he valued his life deeply. She stated he actively and responsibly sought treatment for his mental and emotional health. Ms. Winstel indicated Mr. Winstel used Kratom which he understood to be an herbal supplement on an as needed basis to help manage symptoms of anxiety and depression. She stated he told her it helped him feel calmer and more relaxed. She stated Mr. Winstel began using Kratom in 2016 and purchased it through online retailers. She indicated he was not aware of or warned about the serious risks or dangers associated with Kratom use. Ms. Winstel indicated that Mr. Winstel did not suffer from heart disease or any other cardiac abnormalities and was not taking medication for any cardiac condition. She stated that Mr. Winstel's death was the result of an accidental overdose and he did not intend to harm himself nor did he believe his Kratom use posed a danger to his life.

**Appeal Evaluation**

To ensure a full and fair review on appeal, we have reviewed the information in the file in its entirety and have considered all information, facts and circumstances pertaining to this claim.

During the appeal evaluation, the claim was reviewed by Dr. Varsha Podduturi, an independent physician Board Certified in Forensic Pathology. Dr. Podduturi provided the following summary of the information contained in the claim file:

> *Emily Fiers, D.O. ED Provider Note, 05/07/2025: The claimant was a 45-year-old individual who was found unresponsive on a sidewalk next to their dog. EMS was called and transported the claimant to a hospital. The claimant was pronounced deceased on 05/07/2023 at 8:23 AM after resuscitative efforts.*
>
> *Anne Shepler, M.D. - Postmortem Examination Report, 05/08/2025: An autopsy was performed at the Franklin County Forensic Science Center in Columbus, Ohio, by Dr. Anne Shepler. The cause of death was classified as "combined toxic effects of mitragynine (Kratom) and fluvoxamine." Other significant conditions included "myocardial fibrosis and adipose infiltration with intramyocardial arteriolosclerosis of uncertain etiology". The manner of death was classified as an accident.*
>
> *Franklin County Forensic Science Center Lab Report, 05/09/2025: Mitragynine, fluvoxamine, gabapentin, and lamotrigine were detected on postmortem toxicology.*
>
> *Irix Prescription Summary, 07/22/2025:*
>
> *Atorvastatin 20 milligrams (MG) tablet between 04/21/2024 - 04/28/2025*
> *Buspirone 15 milligrams (MG) tablet #60, 30 day supply, filled between 05/13/2024, 06/21/2024*
> *Fluvoxamine 50 milligrams (MG) tablet #30, 30-day supply filled 05/31/2024*
> *Lamotrigine 200 milligrams (MG) tablet #30, 30 day supply filled monthly between 05/28/2024 and 04/28/2025*
> *Pantoprozole 40 milligrams (MG) tablet, #30, 30 day supply filled monthly between 06/24/2024 and 05/03/2025*

*Pramipexole 1 milligrams (MG) tablet, #30, 30 day supply filled monthly between 05/29/2025 and 04/16/2025*
*Propanolol extended release (ER) 60 milligrams (MG) capsule #30, 30-day supply filled monthly between 05/14/2025 - 04/14/2025*
*Zolpidem 12.5 milligrams (MG) tablet, #30, 30-day supply, filled monthly between 05/15/2024 and 04/18/2025*

Following a review of the available evidence, the review by Dr. Podduturi stated in part,

*The cause of death is listed as "combined toxic effects of mitragynine and fluvoxamine". Contributory conditions are listed as "myocardial fibrosis and adipose infiltration with intramyocardial arteriolosclerosis of uncertain etiology". The manner of death is classified as an accident.*

*The manner of death in a case can be classified as an accident when an injury or poisoning occurs unintentionally.*

*Fluvoxamine is a serotonin reuptake inhibitor (SSRI) medication, which increases serotonin levels. Kratom also increases serotonin levels, creating a high risk for a serious drug interaction. These two drugs taken together are also known to cause a potentially fatal condition called serotonin syndrome.*

*Kratom can affect the heart in several ways, including a risk of heart rhythm abnormalities and increased heart rate. The risk of serious cardiovascular events, including cardiac arrest, is higher with high doses, chronic use, or when combined with other substances.*

*Autopsy findings indicate an enlarged heart with biventricular dilation and evidence of fibrous and fatty infiltration into the heart muscle. Myocardial fibrosis and fatty infiltration can affect the heart's electrical impulses, which may cause an abnormal heart rhythm, which may result in sudden death.*

*Substances detected in the decedent's postmortem blood were the following:*

*Lamotrigine*
*Gabapentin*
*Fluvoxamine*
*Mirtazapine*
*Mitragynine*

*The decedent had prescriptions for mirtazapine, gabapentin, lamotrigine, zolpidem, and fluvoxamine. Gabapentin, lamotrigine, and mirtazapine were detected in the postmortem blood and were at therapeutic/non-toxic levels.*

*People who use kratom can act as a stimulant at low doses. At higher doses, it is reported to cause sedative effects.*

*Fluvoxamine and mitragynine contributed to the decedent's death.*

*According to the autopsy report, gross findings of the claimant's heart revealed an*

*enlarged heart with dilation of the right and left ventricles. Microscopic evaluation of the heart showed areas of fibrous and fatty infiltration of the heart muscle and arteriolosclerosis (thickening of the small arteries within the heart muscle).*

*Myocardial fibrosis and fatty infiltration can affect the heart's electrical impulses, which may cause an abnormal heart rhythm, which may lead to sudden death.*

Mr. Winstel's death was found to be caused by "combined toxic effects of mitragynine and fluvoxamine". The evidence indicates that Mr. Winstel was prescribed fluvoxamine for anxiety and also used Kratom which his wife reported he purchased from online retailers and used on an as needed basis to help manage symptoms of anxiety and depression. As noted above, fluvoxamine is a serotonin reuptake inhibitor (SSRI) medication, which increases serotonin levels. Kratom also increases serotonin levels, creating a high risk for a serious drug interaction. These two drugs taken together are also known to cause a potentially fatal condition called serotonin syndrome. Kratom can affect the heart in several ways, including a risk of heart rhythm abnormalities and increased heart rate. The risk of serious cardiovascular events, including cardiac arrest, is higher with high doses, chronic use, or when combined with other substances.

Accidental death benefits are payable when a covered person suffers a loss ***solely*** as the result of accidental injury that occurs while covered, injury is defined as bodily impairment resulting directly from an accident and ***independently of all other causes***. The evidence on file supports that the "combined toxic effects of effects of mitragynine and fluvoxamine" caused Mr. Nathan Winstel's death.

**Conclusion**

We conducted a thorough and independent review of the entire claim. Based on the facts of the case and the terms of the Policy, we maintain that Mr. Winstel's death was not the result of an accidental injury independent of all other causes. Therefore, no accidental death benefits are payable.

This claim decision reflects an evaluation of the claim facts and Policy provisions.

**The Policy**

The Insight Direct USA, Inc. Group Life Policy states, in part:

***Benefits***

*Accidental Death and Dismemberment benefits are payable when a Covered Person suffers a loss solely as the result of accidental Injury that occurs while covered. The loss must occur within 365 days after the date of the accident. The benefit payable is called the Full Amount. It is shown in the Schedule of Benefits….*

***"Injury"*** *means bodily impairment resulting directly from an accident and independently of all other causes.*

***ACCIDENTAL DEATH AND DISMEMBERMENT EXCLUSIONS***

*No benefits are payable for any loss that is contributed to or caused by:*

*1. war, declared or undeclared, or any act of war;*
*2. intentionally self-inflicted injuries, while sane or insane;*
*3. suicide, or suicide attempt, while sane or insane;*
*4. active Participation in a Riot;*
*5. committing or attempting to commit a felony or misdemeanor;*
*6. disease, bodily or mental illness (or medical or surgical treatment thereof);*
*7. infections, except septic infections of and through a visible wound;*
*8. controlled substances (as defined in Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970 and all amendments) that are voluntarily taken, ingested or injected, unless as prescribed or administered by a Physician;*
*9. serving full-time active duty in the Armed Forces of any country or international authority;*
*10. boarding, leaving or being in or on any kind of aircraft. However, this exclusion will not apply if the Covered Person is a fare paying passenger on a commercial aircraft or traveling as a passenger in any aircraft that is owned or leased by or on behalf of the Sponsor; or*
*11. the presence of alcohol in the Covered Person's blood which raises a presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident. The blood alcohol level is governed by the jurisdiction of the state in which the accident occurred; or*
*12. hazardous sports, including but not limited to, motor sports (land or water), mountain climbing, skydiving, parachuting, bungee jumping, hang gliding and scuba diving*

***"Proof"*** *means the evidence in support of a claim for benefits and includes, but is not limited to, the following:*

*1. a claim form completed and signed (or otherwise formally submitted) by the Covered Employee or his beneficiary claiming benefits;*
*2. an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and*
*3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits;*
*4. a certified copy of a death certificate.*

*Proof must be submitted in a form or format satisfactory to Lincoln.*

Under the Employee Retirement Income Security Act (ERISA) appeal guidelines, Ms. Winstel was entitled to appeal the decision made by Lincoln, and to submit any additional information she wished to be considered as part of the appeal. Lincoln has conducted a full and fair review of this appeal and we have determined that the denial of benefits will be maintained.

At this time, the administrative right to review has been exhausted and no further review will be conducted by Lincoln. You may request to receive, free of charge, copies of all documents relevant to the claim. You have the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

The Insight Direct USA, Inc. Group Life Policy contains the below provision:

> ***Legal Proceedings***
>
> *A claimant or the claimant's authorized representative cannot start any legal action:*
>
> *1. until 60 days after Proof of claim has been given; or*
> *2. more than one year after the time Proof of claim is required.*
>
> *Legal actions are contingent upon first having followed the Claims and Appeals procedure outlined in this policy.*

The Insight Direct USA, Inc. Group Life Policy has a contractual limitations period of one year, which means that a lawsuit must be brought within one year after the date written proof of claim was required. The date on which the contractual limitations period expires for this claim is June 06, 2026.

Nothing in this letter should be construed as a waiver of any Lincoln rights and defenses under the above captioned Policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Decisions made by Lincoln are based on the provisions outlined in Insight Direct USA, Inc. Group Life Policy. No internal rules, guidelines, protocols, standard or other similar criteria were relied upon in rendering the claim determination.

If you require language translation assistance, please contact Lincoln to initiate a service provided free of charge to assist with understanding the claim and appeal rights.

如果您需要翻译方面的帮助，请联系我，我会免费为您服务以便了解您的要求和诉求。

Shá ata' hane'go shíká a'doowoł nínízingo saad hosíníłį́į' dóó ná'ookąąh nííní'ą́ągo naaltsoos nííníłtsoozígíí hazho'ó bik'idi'deeshtį́įł nínízingo doo bą́ąh ílínígóó níká a'doowoł éí biniiyé shił hodíílnih áko ákwe'égi níká adeeshwoł.

Si necesita traducción, contácteme para iniciar un servicio gratuito a fin de ayudarle a entender sus derechos de reclamo y apelación.

Kung nangangailangan ka ng tulong sa translation, mangyaring makipag-ugnayan sa akin upang gumamit ng serbisyong ibinigay nang walang bayad upang matulungan kang maunawaan ang iyong mga karapatan sa paghahabol at pag-aapela.

If you have any questions regarding this matter, please contact me.

Sincerely,

Tawnya V.
Claim Resolution Specialist
Phone No.: (888) 437-7611 Ext. 15894
Secure Fax No.: (603) 334-0401